Oral argument not to exceed 15 minutes for the plaintiffs and 15 minutes will be shared by the defendants. Mr. Desi, when you're ready, for the appellants. Good morning, Your Honors. Your Honors, may it please the Court. Michael Desi, I'm here on behalf of the appellants and the plaintiff in this matter, Sarah Zeller. Your Honors, the record in this case is quite voluminous, the summary judgment record, and so that's really what we're focusing on today. The District Court granted summary judgment on my client's claims both under Title VII and also her FILA claims against the, what we allege to be her employer under FILA, which was Canadian National Railway Company. The District Court found in rejecting my client's FILA claim that there was no evidence of a master-servant relationship, so I'd like to start there. I believe that the District Court reached that conclusion by ignoring what was a wealth of record evidence which demonstrated otherwise. The U.S. Supreme Court has said and has held in previous cases, Baker being one of them in particular, that if there is some evidence of a master-servant relationship, then that question should be submitted to the jury. And we had relied upon that case and cited it, and we had marshaled a lot of evidence in support of that particular master-servant relationship. The key piece of that evidence, number one, was the defendant's written admission—this is Canadian National Railway Company's written admission—that one of their senior managers, Alice Perez-Da Silva, oversaw the daily operations of the subsidiary in question, Canadian National—CN Customer… My opponent says that that was in a different capacity. I understand my opponent says that, however, that's a factual dispute. Now, in her deposition, Ms. Perez-Da Silva testified that she was an employee of Canadian National Railway, and her counsel also stipulated to that on the record. And they admitted that in their written discovery responses, that she was a senior manager of Canadian National Railway, and that she oversaw the daily operations. So it's our position that the defendants can't simply come in now and offer an affidavit and have Ms. Perez-Da Silva say, well, when I was there, I was actually acting in the capacity of a board member of CNCBS. That's not what they said in the written admissions that they made in discovery. So that's simply a question of fact, but also— And the fact will still be important to her. That's correct. She was involved in this whole thing. That's correct. That's correct. And in an email that she sent to Susan Ward, another senior manager for Canadian National Railway, Ms. Perez-Da Silva indicated, Mr. Wilson reports to me, and she asks Ms. Ward, what are we going to do about this? There are employees of CN who are harassing these women at the rail yard. This evidence wasn't discussed by Judge O'Meara at all in the summary judgment opinion. It was completely ignored. In fact, he reached the inconsistent position of saying there was no evidence of it. Now, like I indicated, the summary judgment record is very voluminous in the case, and I have cited these very specific instances of what was in the summary judgment record in support of this. So the reason I'm starting with the evidence of the master-servant relationship is because I believe the other claims fall in line behind the FELA claim. Having marshaled this evidence in support of a question of fact on the master-servant relationship with Canadian National, we believe that that claim should have survived summary judgment. And then behind that, you have the Title VII claims. So there were issues. There were some procedural issues of exhaustion remedies and whether my client had sufficiently named or had named the entities in part as part of her EEOC complaint. And I'd like to discuss that. So when my client filed an EEOC charge, she named CN Railroad, which we all agree that's not the legal entity. That's not the name of the legal entity. But this court has recognized in previous decisions, and I'm speaking specifically of the Romaine v. Keurig decision, this court has recognized that the failure to actually identify one of the employers may be excused under certain factors. Well, I believe that we meet those factors because the record shows that Illinois Central's legal counsel, Constance Vulcan, was made aware of the harassment as it occurred because my client's attorney sent a letter to her employer. And that employer was forwarded to Ms. Vulcan, legal counsel for Illinois Central. So Ms. Vulcan was involved, and she was involved in discussions along the way after the harassment was occurring. My client was receiving these vulgar, explicit, threatening notes, and Ms. Vulcan was involved in that – in those discussions. And then she was sent a copy of – Oh, sure. I'm sorry. No, no. I'm just thinking that – and I'm sorry for interrupting your train of thought, but I'm just thinking what more – assuming that there was an employee relationship that you're alleging. Assume we find that. Well, what more could have any of these entities done in this case? Well, the question of whether they took reasonable remedial measures I believe is also highly disputed. So what they did – Well, what should they have done? Well, for one, the director of human resources said somebody needed to go to Procurat as part of this investigation. Nobody went. So if the direct – Yeah, but then – Okay, well, I'll explain that. They could have put up TV cameras. Sure, they could have put up cameras sooner. They did put up cameras. There were issues, safety issues in the actual rail yard. Those were commented about by our experts. Those expert reports were completely ignored in the record, completely ignored. We had a safety expert who visited the site. She offered opinions as to whether the site complied with certain safety procedures under OSHA, whether there was deficient safety measures taken, whether the actual HR, whether the human resources investigation was deficient. The only thing that happened here was they conducted a phone investigation over a period of about seven or eight days. Once they asked the CN police to get involved after she received yet other notes, the CN police came out and basically asked if she was flirtatious or having an affair. So the position – This is a Title VII hostile workplace case. I'm sorry? This is a Title VII hostile employment situation. Yes, the Title VII claims are a hostile work environment. Now, usually when you determine whether something is a hostile work environment, you don't prove it by saying the investigator didn't arrive in time. Well, no. That point goes to whether they took sufficient reasonable precautions to remedy – Sufficient reasonable precautions. That goes to the – right. Why can't they judge this question to be why weren't these sufficient reasonable precautions? I mean, what you suggest is there might have been OSHA violations. I mean, it just doesn't – That – no. It doesn't sound like that to me. Well, the point that I'm making – the point that I'm making is that the investigation itself was deficient and that the steps that were taken were not reasonable in curtailing the harassment that was going on. We know that because she was – Why were they – how were they not unreasonable? Well, they didn't do anything other than conduct a phone investigation. And then they sent her a letter saying, we don't find any violation of your policy. This court in Jackson v. Quanick said to simply deny the harassment isn't taking effective reasonable – Did they have a meeting at the site? Did they get all the guys from the railroad and say we have these complaints? If this happens again, we're going to find who did it and they're going to be out. No. No. There was nothing like that. And the interview that they did with each person, you're saying that was over the phone? By phone. Okay. So there's no credibility. There's no, well, did you do this? No? Okay. That's right. And that's what our expert opined in her report. Following standard human resources best practices. Did they take the notes and try to get fingerprints? No. Did they send the condom? The condom was sent out by the San Police force at some point later, but that was perhaps – I don't know if that was October or November. This is after she'd been receiving these notes. I want to F you. Your boss wants to F you. That happened way after they already sent the letter saying we can't find any violation that's even occurred here. So the reason I'm citing this panel to the court's prior decision in Jackson v. Chronix is because in that case, the court addressed very similar circumstances and said, look, to simply deny – Who decided to investigate in early September? I'm sorry? Who decided to investigate in early September? Did the site – Whoever is involved in this joint enterprise that you're talking about. They decided to investigate in early September. That's correct. And they say that they only had notice in September, but that's also disputed because the investigator, Veronica Lowy, had notes and testified in her deposition that my client had reported this in June of 12, that there had been conversations in June of 12. And urged that it not go any farther. That's right, but under this court's decision in Clark v. UPS, this court has laid down what constitutes reasonable anti-harassment policies. And in this case, the defendant's policies are deficient under this court's prior precedence. The reason that's important is because if a company has deficient anti-harassment policies, the court has found that they cannot then make the affirmative defense that their reasonable precautions were reasonable. So that goes to the second step of that Title VII inquiry. If the harassment is severe and pervasive, the next step is – It's this report that most of the people say was made in September, but there's at least some evidence that it was made in June. That's correct. Was of one incident with few details. That's – That's correct. Okay, correct. But in answering your question about whether the harassment was severe and pervasive, this court in Williams v. General Motors has said, in looking at that component, you look at all instances, whether they were reported or not. And that's because that component looks to whether they knew or should have known. Whether there's reasonable response. That goes to – You also look at all the things that they don't know about. Well, that's the second step. First, we were talking about whether the harassment was severe and pervasive. Under that inquiry, we look at all – So she received several of these things. You can certainly say that it was pervasive or severe. I'm not sure. She did receive several of them. And then after they sent her a letter, responses seemed like – It's like Judge Hood says. What more should they have done? If they could find things that they could have done, there would have been more. But for one report of a vague incident without details and with an urge that it not be reported further, to wait a couple months before having it, I don't know, what's restated or more clearly brought forward, and then to go into a big investigation. Well, I feel that just doesn't ring of whatever the standard is. Well, I disagree that it was a vague report. The report was that somebody wanted to have sex with her in the bathroom. At that point, it wasn't kept confidential, nor did she ask that it be kept confidential. After that, she received several more notes. They sent her a letter saying, we can't find any violation. She gets another note two weeks later with her supervisor on her car that says, I want to F you, your boss wants to F you. She gets another note, camera, she's mine. I mean, this was happening. I understand, but we're talking about when you're focusing on what happened, nothing happened between June and September. That's correct. The note says, the complainant said during one of her trips to the restroom, someone made an inappropriate sexual comment to her. Didn't tell the name of the employee or what the sexual comment was, but did say she didn't want anyone to get in trouble over the incident and didn't want to file a formal complaint. And that's exactly why this court has sent her out. That's quite vague, isn't it? Well, that might be the June report, but there were several reports out now. September, yeah, that's a lot more. In September, they acted. In September, you know, they went through all these stages, which you say was enough to make it a joint employer relation, but they finally came up with someone to investigate, and that person then investigated. No, I don't agree. As Judge White had indicated, if anyone came to the rail yard and asked who did this, they'd have to be there to investigate in order for it to be a reasonable investigation. Their HR director thought so. Their HR director thought so, and so did our expert. But I am out of time. Unless you want me to continue answering the question, I did reserve four minutes for your bottle, Judge White. Thank you, counsel. Thank you. Good morning. Good morning. My name is Kate Rukinich-Rosen, and I'm here to represent CN Customs Brokerage Services USA, Inc. That's a mouthful, so I will refer to that employing client as CNCB. And I also represent Stellar Distribution Services, Inc., and my co-defendant is Mr. Joseph McDonald, celebrating the luck of the Irish today as well. I think what's really important, and if it pleases the Court, I'd like to begin with what is being, I think, overlooked, and that is the legal standard applicable here. The Williams case, the Sixth Circuit Williams case that counsel has referenced, is very clear on this point. What we have is a person who is in a tragic situation who does not know who victimized her. She cannot identify the person to this day that she believes harassed her. The employer then has a duty under the, as articulated by the Williams case, to deal with this as a case of what did the employer know or what reasonably should it have known. And then the inquiry is not, well, first we then see, as the district court properly noted, that in response to what it knew or should have known, the employer, CNCB, exhibited and showed prompt and appropriate remedial responsive action to correct the circumstances that would lead to future sexual harassment. It met its burden. But what's also important here is that the burden on the plaintiff is not just to show negligence by the investigating employee entity, but to show indifference and unreasonableness, and that standard is far from met. I don't understand how you have somebody writing notes like this and actually accosting her, and you have a few telephone interviews. Because, Your Honor, going back to what the employer knew or should have known, the reference to accosting her never happened until the EEOC charge of litigation in this case. So I think what I should go back to, I think, are four key facts in the timeline of what the employer knew or should have known. What Sarah Zeller says, she reported. She said in her deposition, quite frankly, the only incident that you reported to Roger Wilson was the May 12th incident. Is that correct? Her answer was yes at her deposition, page 91. I can't hear what you're saying. I'm sorry. Sarah Zeller was asked, when was the first discussion you had with Roger Wilson where you reported sexual harassment? And she said in September after Labor Day. That's when she reported sexual harassment. That was Ms. Zeller's testimony. So if we start there in September of 2012. Did she report to somebody in June? What? She never testified about that. She didn't have any recollection of that or offer that. She was quite clear in her testimony that she believes her first complaint was made in September of 2012. And that is cited in our briefing. There is some evidence in the record of earlier. What is in the record is that the investigator in her handwritten notes was asked what her handwritten notes said, and what her notes say is that, as you properly read, of course, that Mr. Wilson told her in September when she was investigating that back in June he recalled Sarah had said something about a male making an inappropriate sexual comment that she wouldn't or couldn't identify who said it and who employed that person, and there was nothing more. That is properly quoted. Then moving into September, when this report was made and Mr. Wilson became aware, Veronica Lowy was the person assigned to investigate. There was a vacancy, a side notice, there was a vacancy in the HR position reporting into CNCD at that time, so they reached out for help, and Veronica Lowy became the investigator. She spoke with eight people and had very lengthy and detailed conversations. Those were by telephone. Nobody could identify, and I think what's important to remember is CNCD is a very small workforce, had something fewer than 11 employees at the time, and she said, Sarah Zeller said, this isn't anybody I work with. I didn't know this person, and it wasn't a person that shared the trailer working for seller distribution. I know all those people. There's a yard out there, right? There's a train yard, right? Right, and so in talking to people, I think it's important to note that in September, Veronica talked to the people that Sarah Zeller had identified as present and around. She tried to find out information. Then I think moving to my second feedback is that in October, management reached out to Sarah Zeller on October 18th and said, how are things going? It's been a month. We haven't talked. We want to make sure everything's going okay. Sarah Zeller said, you know, I actually found a note that said, I still want to F you. Oh, where is the note? And she said, well, I just threw it away. And that's when management said, you need to preserve this evidence. We need to be able to look into the notes. The next week, that manager followed back up with her and said, how are you doing now? This is the second time in October. Counsel, I mean, you know, I guess there's a difference of opinion here. I don't understand how somebody doesn't go out to the yard, have a meeting, speak to every single person out there, and say, these notes are here, and they're going to stop. Okay, then when that happened in October, the notes came in October. On October 25th, the police came to the site. Sixteen trained crew members were interviewed, and we had produced those notes in that discussion. Nobody could find a person or a person. Did she give a description of what the person was wearing? Not really. It was very vague. I thought she did. I thought she referred to the pants. Well, she said something about pants. If you go to the railroad, she described almost the physical description of everybody at the yard. She described some kind of jeans and brown boots. She said she was looking down, and that's it. I think she tried to describe at one point she had used a reference and name, but that name didn't track in any of the roles, because you have to remember this is a restroom that if you're a delivery person, you can have access to this restroom. If you're, you know, people drive vans in and out of there, Federal Express or some type of overhead mail services come. You know, this is a customs processing area as well as a train yard. So there are a lot of people coming through there, but they did. On October 25th, Sarah Zeller gave a statement to the railroad police that was quite specific, and throughout all of this, she's never alleged physical touching. She did at her deposition, and she did in this litigation. But at the time, what she had alleged was the three no's and the comment that was made. When did she first allege that she was accosted or touched? In the litigation. After she left employment. After she left employment, after she quit work. When she left employment, her husband wrote a note the next day saying, or while she was gone, expressing the extreme appreciation for Mr. Wilson and Alice Perez De Silva's kindness shown towards Sarah through this difficult process. This isn't an employer that showed indifference or unreasonableness. I also do, I recognize the district court ruled on this issue, and I think you passed it over it to talk about the standards and the severe pervasiveness and the prompt and appropriate response of the entities, but CNCB is the employer here, did not have 15 people, and there isn't the interrelationship that we can talk about. Well, I mean, all of these people, which of these, De Silva, obviously, I mean, she said in her deposition, she does run the day-to-day over there. She's issued answers to her, and everybody has the same manual. The rules, the harassment rules come from the top, from CN. They're not rules for her employer. They're rules for everybody. Well, each of the entities has a policy that it follows, and I think what we see is she was a vice president of operations over CNCB, so she did have that direct responsibility, and Roger Wilson actually ran the hiring and firing on a day-to-day basis on site and reported in to her. She's the one that hired Zeller, didn't she? Roger Wilson did. He had worked with her previously. Didn't she extend the offer for employment? I apologize. I don't recall offhand, because I know the relationship came with Roger Wilson having worked with her, and he had testified he hired her, and if there was approval or an offer from Alice, that is in her capacity as his supervising manager approving his decision on site. Sarah Zeller recommended this as a workplace to another person who testified in this case. In August of 2012, a woman by the last name of Sexton... Who does Ward work for? Pardon? Who does Ward work for? Ward was contacted. Ward is an employee of CNR, and she was contacted when Alice and Roger Wilson were looking for help because of the vacancy in the human resources position for help. The fact of reaching out for the administrative services of a professional to assist... The whole statutory management is all meshed. I don't believe the record substantiates that. I think what you see are separate day-to-day management of operations and processing, and the finances are kept independent. Thank you. Good morning. May it please the Court. Joseph McDonnell on behalf of Canadian National Railway Company, and I also represent Grand Trunk Western Railroad Company, an owner of Central Railroad Company. I guess the first question, the first issue Mr. Desi addressed was whether or not Ms. Zeller was an employee of Canadian National Railway Company for the purposes of the FDL. I think the record clearly shows that she was not. She was not a borrowed servant or dual servant. She was performing work as a customs analyst for... I'll use the abbreviation to CNCBS. That's the standard under the FDLA is you have to be either joined or... No, there's a third test, which I was going to get to, Your Honor. Whether or not Plano was a subservient of a servant. There's a subservient of a servant, and then there's a servant, and then there's, what's the third one? A dual servant or a borrowed servant. They're both servants. It's not the same doctrine as would apply under Title VII. No, it's a different set of doctrines. The FDLA has a different set of law, and it applies to railroads. It's real clear that Canadian National Railway Company did not control the day-to-day operations of the customs analyst in the trailer for CNCB in Port Huron. At best, you have Alice Preston Silva, who is an officer of CNCB, who is also an employee of Canadian National Railway Company, but she's simply wearing two hats, and the law allows this, and the law presumes that people can wear their two hats simply. The Policy Council says that's an issue of fact as to whether that's the case. Well, I don't think they've presented any evidence that when she was doing one thing for one company, she was not doing it just for that company or for the other company. I can't hear you. I'm sorry. I'm sorry. I don't think there's any evidence that when Ms. Preston Silva was acting in her capacity as vice president, I can't remember the title, operations for customs brokers, that she was not acting in that capacity and not as a manager for Canadian National Railway Company because her other duties involved different issues in Canada that she was supervising. So there's no evidence that CNCB was a puppet or alter ego of Canadian National Railway Company or anyone really. The affidavits of President Silva and Wilson show that really her day-to-day operations were by customs brokers and not Canadian National Railway Company, and Judge O'Meara, I think, was right in determining that for the purposes of the FVLA, looking at the tests and... Who maintained the premises? I mean, Judge White talked about there's a big yard out there and she has to cross the yard. Well, it's a Grand Trunk Western Railroad Company yard, and there's no dispute about that in the record. But the Grand Trunk is a Michigan corporation that runs a railroad in Michigan that extends into Ohio and the end into Illinois. But the plaintiff did not appeal the dismissal of this Grand Trunk Western Railroad Company. Grand Trunk is a wholly owned subsidiary of CNR. Well, they're an indirect subsidiary, about four layers or three layers removed from Canadian National Railway Company. So you're saying if there wasn't a FVLA violation from the maintenance of the... Well, and that goes to... ...the wrong party, is that what you're saying? Right, and Illinois Central Railroad Company has some involvement in that. Some of its managers are assigned to assist in the management of Grand Trunk. But again, the plaintiff did not appeal the dismissal against Illinois Central. But...and they had a number of issues on that as well. Can you try to keep your voice up? They had a number of issues on that as well, because just like Canadian National Railway Company, Grand Trunk and Illinois Central were not employers. They were not named in the charge on the Title VII side of the case. In fact, Illinois Central, the statute of limitations had run against them by the time plaintiff amended to add them as a party. But under the FVLA, it's a negligence action. I understand it's a little more... The causation standard is more liberal than the common law. But it's still... Well, the difference is cause and whore in part instead of approximate cause. And...but there still has to be negligence, and there still has to be causation. And I'm trying to understand where the negligence, even if you assume that she was an employee of Canadian National Railway Company, existed. They had no notice of any problems in the yard in Port Huron prior to the event in May, which the plaintiff said occurred, of anything of this type. There's no evidence that there was any problem with the locks or doors in May of 2012. And even after May of 2012, Canadian National Railway Company certainly had no notice until... Alice Preston-Silva asked for a recommendation on how to get some human resources assistance from a Canadian National Railway Company employee in Montreal. And all she did was say, I'll see if Illinois Central can help you out. They asked Mr. Brockwell. He said, yeah, we'll do it. There was no... notice of any dangerous conditions in the yard prior to anything reported in this case. And in fact... But the argument is what they did after they were reported, not what they did before they were reported. Well, then let's look at Gottschall, Your Honor, for what happened after they were reported, because we're basically talking about psychological damages. And unless there's an imminent threat, a physical impact or a physical impact, there can be no liability under the F.E.L.A. But... There's no liability if they're subject to these kind of sexually harassing notes on an ongoing basis and speaking apathetically. They just don't react to that. Not in the absence of a physical impact or an imminent threat of physical impact. That must be the law. You've got to have impact. You can't just be... That's correct, Your Honor. That's the whole thing in Gottschall. And that's how the F.E.L.A. Most women that were... Most women that are reported by a guy in a bathroom, a mirror bathroom, and he says something like that, whether she's touched or not, would have a reasonable fear of imminent impact. Well, and then we're back to the notice issue if you're talking about the May of 2012 incident, Your Honor. And first of all, it's not Canadian National Railway Company's bathroom. It's Brian Trump's bathroom at its yard office in its yard in Port Huron. But secondly, up until that event happened, as plaintiffs reported it, assuming it happened that way, there was no notice to anybody of any prior incidents in the yard in Port Huron, Canadian National Railway Company, or anybody else that there was any danger to any employees in the yard. And besides physical impact, notice is a prerequisite to liability under the F.E.L.A. If you look at the case law that I've cited in my brief, I had hoped to address some of the Title VII issues that are covered in my brief, unless the court has some questions about those. No, thank you. Thank you. Thank you. Thank you, Your Honor. Judge White, to answer your question, yes, Perez de Silva did extend the offer of employment to my client. It's in the record. It's cited on my brief, page 51 of my opening brief. Perez de Silva officially extended the offer of employment. So again, we're back to more questions of factors to the control by CN. Judge Rogers, I would like to make a point about your questions. Even if the court may be convinced that perhaps the entities took sufficient, reasonable, remedial measures after they were made aware of the harassment, even if that were the case, we still have the F.E.L.A. claim, which is a negligence standard, and that would still put us back to the assault in May and the threat of the harm thereafter. So even if the court were to say, well, we think that these steps are reasonable, the negligence standard under F.E.L.A. is a separate standard. It's the negligence in allowing the assault to happen. That's correct, and in Green v. Rivers... The process with respect to that, there was no notice of anything prior to the assault. Well, I disagree. Josie Evans, an employee who was interviewed by Lowy, said she was routinely whistled at. She felt like a piece of meat. She said, I should be able to go to the bathroom without feeling like a piece of meat. Yeah, she may have said that, but did the railroad know? Your Honor, respectfully, that is not the question. It's whether they knew or should have known. If you have guys whistling at these girls... Come on, counsel, give me a chance. How should they should have known? Well, how about guys whistling at women in the rail yard? Nobody knew about that? Josie Evans says she feels like a piece of meat, and nobody knew? That's not... Did she report it to anybody? It was happening all the time. Did she report it to anybody? There's no record evidence about whether Josie Evans reported it. However, Ms. Lowy made notes in her investigation that said the harassment probably happened to other women. When this happened, did the railroad have any knowledge? I believe that they did. If the standard is that they knew or should have known, and you have women that are being treated this way... How should they have known other than the fact that you say that there were people whistling in the yard? Okay, but again, my point is a little different. Under Green v. River... Who was whistling? I'm sorry? Who was whistling? The men in the rail yard. What men in the railroad? That's what Josie Evans testified to. That's the record. Who was whistling to Josie Evans? Probably all of them. I don't know. Well, see, that's his problem. No one knows. But we don't have to prove that. The standard is that they knew or should have known. In Green v. River Railway, this company said that the railway can still be responsible under FELA for a risk of assault. So even if the court says that there were reasonable precautions, it doesn't address the negligence claim. My sister counsel said the duty isn't to show... What was the risk of assault in that case? I'm sorry? What was the risk of assault in the case you're referring to? Well, in Green, I'm pointing out that the standard that was enunciated by this court was that it could be that they had knowledge or they knew of an assault, or that it could have been the risk of an assault. Do you know what the risk was in the case that you were citing? Well, in that case, there was a directive verdict  that they had any knowledge or should have known. That's the standard. So what the court's asking me to prove is too much. And under FELA, we have to prove a negligence claim, a separate standard from what would be required under Title VII. So when they say that, well, you know, the yard was owned by Grand Trunk Western, Susan Ward said that Canadian National Railway had a duty to make that premise of state. Why would she say Canadian National had a duty if now they want to say, well, Grand Trunk actually was the owner of the rail yard? Canadian National Railway senior manager, Susan Ward admitted in her deposition that they had a duty to my client to make the premises safe. Who's subject to the act? Railway carriers. Which? Canadian National Railway would be subject to the act. Okay, so they're the only defendant that's subject to the act. That's correct. Grand Trunk would have been if there would have been master-servant relationship, but we didn't pursue that. We have appealed, or excuse me, Judge O'Meara dismissed the state claims against Grand Trunk Western, and that case we have filed in state court because he declined supplemental jurisdiction over the state claims. Okay, counsel. Thank you. Thank you, Your Honor. The case will be submitted. I appreciate your advocacy. Please call the next case. Thank you.